United States Bankruptcy Court
Northern District of Illinois
Eastern Division

| | |
|---|---|
| In re:<br><br>Laurina Kim Bukovics,<br><br>Debtor. | Chapter 7<br>Bankruptcy No. 15 B 38069<br>Honorable Judge Jack B. Schmetterer |
| Laurina Kim Bukovics,<br><br>Plaintiff<br><br>v.<br><br>Navient,<br><br>Defendant. | Adversary No. 17 A 186 |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Debtor Laurina Kim Bukovics ("Plaintiff") filed for bankruptcy relief under chapter 7 of the Bankruptcy Code on November 9, 2015. That case was closed without a discharge on March 7, 2016 for Plaintiff's failure to file Official Form 423. On April 10, 2017, Plaintiff moved to reopen her bankruptcy case in order to file a complaint against Navient Solutions LLC ("Navient") seeking to discharge her student loan pursuant to 11 U.S.C. § 523(a)(8). That motion was granted on April 20, 2017. Plaintiff was granted a discharge on that date and the instant adversary proceeding was initiated. Navient filed its proof of claim in the amount of $68,702.01 shortly thereafter. On May 5, 2017, Great Lakes Higher Education Guaranty Corporation, the assigned holder of the student loan, assigned the loan to Educational Credit Management Corporation ("Defendant"), which has intervened in this adversary as the proper defendant.

Trial was held on May 7 and May 8, 2018 on Plaintiff's complaint. Oral closing argument was heard, and the parties subsequently filed joint proposed findings of fact including all facts upon which the parties agreed and individual findings of fact and conclusions of law.

For the reasons stated below, it is found and held that Plaintiff is not entitled to a discharge of her student loan pursuant to 11 U.S.C. § 523(a)(8) and the Seventh Circuit authority interpreting that provision of the Bankruptcy Code.

The Court now makes and enters the following Findings of Fact and Conclusions of Law.

1

## FINDINGS OF FACT

### I. Plaintiff's Loans and Repayment History

Plaintiff is an Illinois resident who was born in 1967 and is currently 51-years old. In the fall of 1985, Debtor enrolled as a freshman at the University of Wisconsin. In August of 1990, Plaintiff graduated with a Bachelor's Degree in Communications from the University of Wisconsin. During her time there, Plaintiff received 13 separate student loans, consisting of nine Stafford Subsidized loans, two Federal Supplemental Loans for Students, and two Perkins Loans. Plaintiff's loans totaled $20,896.00 and accrued interest at rates between five and eight percent. At no point did Plaintiff take out any private student loans.

The required repayment period of Plaintiff's loans began on February 15, 1991. From 1991 to 1997, Plaintiff made some payments on her loans, but record of payments made during that period no longer exist. At times during this period, the loans were put in forbearance and Plaintiff was excused from making payments. Plaintiff defaulted on the two Perkins loans on March 2, 1992. In April of 1997, Plaintiff applied to SallieMae, the then loan servicer, to consolidate all of her student loans into one. To be eligible for such a program, Plaintiff had to make three voluntary, consecutive, and timely loan payments.

On June 17, 1997, Plaintiff's application for consolidation of her loans was approved. The consolidated principal of the loan balance at that time was $30,051.83 at an interest rate of eight percent. Plaintiff was to make payments over 20 years with periodic increases in the monthly amount. The initial payments were set at $208.71. From July 1997 through 2015, Plaintiff made the following payments on the consolidated student loan:

| Dates: | Payments: | Reason: |
| --- | --- | --- |
| July 1997 – June 1999 | $0 | forbearance |
| August 1999 – August | 13 payments of $233.38 | |
| August 2000 – August | $0 | forbearance |
| September 2001 – March 2004 | 29 payments of $252.87 (2 payments short by $4.83) | |
| April 2004 – May 2004 | $0 | |
| June 2004 | 1 payment of $255 | |
| July 2004 – January | $0 | forbearance |
| March 2005 – September 2008 | 44 payments, ranging between $111.94 and $685.92; average payment of $360 | |
| October 2008 – November 2008 | $0 | |
| December 2008 | 1 payment of $400 | |

2

| January 2009 | 1 payment of $373.90 | |
|---|---|---|
| February 2009 – May 2009 | $0 | deferment |
| March 2009 | 1 payment of $30 | |
| June 2009 – July 2009 | $0 | |
| August 2009 – November 2009 | $0 | deferment |
| November 2009 – May 2010 | $0 | forbearance |
| March 2010 | 1 payment of $48.20 | |
| June 2010 – November 2010 | $0 | possible deferment |
| December 2010 | $0 | |
| January 2011 – June 2011 | $0 | forbearance |
| July 2011 – September 2011 | $0 | |
| October 2011 – August 2013 | $0 | forbearance |
| September 2013 – December 2013 | $0 | |
| January 2014 – February 2014 | $0 | forbearance |
| March 2015 – October 2015 | 6 payments; average payment amount is $116 | |

Covering the period of July 31, 1997 through July 1999, Debtor applied for and received forbearance from the payments due on her student loan. No payments were made during this period. Interest continued to accrue and was capitalized to the loan balance. As of July 14, 1998, the balance owed on the loan was $32,377.67. As of January 25, 1999, the balance owed on the loan was $35,675.45. From August 1999 through August 2000, Debtor made 13 consecutive monthly loan payments of $233.38 each. From August 27, 2000 through August 2001, Debtor applied for and received forbearance from payments due on her student loan. From September 2001 through March 2004, Debtor made 29 loan payments of $252.87 each (except that two of the payments were short by $4.83). In June of 2004, Debtor made one payment of $255. There is no record of forbearance or payment for the months of April and May, 2004. On July 25, 2004, Debtor applied for and received forbearance from payments through January 2005. From March 2005 through September 2008, Debtor made 44 payments on her loan, ranging between $111.94 and $685.92, with an average payment of $360.

In November of 2008, Debtor's then employer, LandAmerica, ceased operating and filed for bankruptcy. LandAmerica's senior managers were charged with operating a Ponzi scheme. No charges were ever brought against Plaintiff, and she was in no way implicated in this wrongdoing. Due to her unemployment, Debtor submitted a request to SallieMae for an

3

Unemployment Deferment on November 30, 2008. While that request was pending, Plaintiff made two payments on her loan, a $400 payment on December 2, 2008 and a $373.90 payment on January 5, 2009. As of January 5, 2009, Plaintiff had paid $28,346.76 on the consolidated student loan since June 17, 1997.

On January 23, 2009, Plaintiff inquired of SallieMae on the status of her request for Unemployment Deferment. SallieMae responded that Plaintiff needed to submit additional documentation supporting the request. On February 1, 2009, Plaintiff's request for Unemployment Deferment was approved through May 2009. During this period, Plaintiff made one payment of $30. Interest continued to accrue during the deferment period. On June 12, 2009, SallieMae informed Plaintiff that her loan balance had reached $37,610.19. By October 12, 2009, the loan balance had reached $38,541.05.

In 2010, Plaintiff remained unemployed apart from two months of contract employment with Nielsen, during which she earned $8,232. Plaintiff's only other source of income was unemployment compensation, of which she received $534.00 per week during most of 2010. On February 8, 2010, Plaintiff contacted SallieMae regarding repayment options. SallieMae granted forbearance retroactive to November 2009, and Plaintiff made one payment of $48.20 during this period. By April 9, 2010, SallieMae notified Plaintiff that the current loan balance was $40,072. On November 11, 2010, the loan balance had reached $41,904.72 and SallieMae indicated that the monthly payment amount would increase to $440.24 once payments resumed.

Plaintiff was also unemployed during the entirety of 2011. At some point during that year, Plaintiff's unemployment compensation ceased. Plaintiff had no other earnings in 2011. On January 4, 2011, Plaintiff again contacted SallieMae regarding repayment options. SallieMae notified Plaintiff that the request for unemployment deferment could not be granted because payments had already been postponed for the maximum time allowed for unemployment. SallieMae advised Plaintiff of other payment options. On January 5, 2011, Debtor applied for and received forbearance from payments due from January 2011 through June 2011 (later extended through May 2013). No payments were made during this period. On October 5, 2011, SallieMae notified Plaintiff that her loan balance had reached $47,228.07. SallieMae notified Debtor that the balance remained at $47,228.07 on May 12, 2012, and also stated that the payments would increase again to $498.90 once the forbearance period ended.

Plaintiff began to receive some part-time contract work in mid-2012. However, it was not until early 2013 that Plaintiff became regularly employed, this time as a marketing specialist, at a salary of $31,097. SallieMae contacted Plaintiff on May 10, 2013 and indicated that her loan balance had reached $51,119.47, and that the monthly payments had increased to $540.01. In order to reduce these payments, Plaintiff contacted SallieMae on November 20, 2013 and applied for an Economic Hardship Deferment. SallieMae informed Plaintiff shortly after that additional information would be required for her request.

Between June 2013 and January 2014, SallieMae granted Plaintiff forbearance. On December 27, 2013, Plaintiff was notified that her loan balance had reached $53,566.10 and that her monthly payments would increase to $565.87. Plaintiff again applied for an Economic Hardship Deferment on March 25, 2014, but was notified that the application could not be processed because it was incomplete. On April 2, 2014, SallieMae informed Plaintiff of alternative payment plans including Income Based Repayment. On April 30, 2014, Navient took over responsibility for servicing Plaintiff's loan.

Navient contacted Plaintiff on June 1, 2014, informing her that the principal of her loan balance had reached $54,348.21. Plaintiff applied for an Income Sensitive Repayment Plan on July 21, 2014. That application was granted on July 31, 2014, allowing her to pay only $79.20 for five months. Plaintiff applied for and received forbearance of payments on September 3, 2014. On November 25, 2014, Navient informed Plaintiff that her loan balance had reached $57,195.84.

On March 19, 2015 Navient informed her that the balance had risen to $58,355.36. Plaintiff applied for and received entry into an Income Sensitive Repayment Plan on March 22, 2015, effective through July 2015. Between March 2015 and October 2015, Plaintiff made six payments totaling $697.29. By this time, Plaintiff had paid $29,122.25 on the loan consolidated in 1997. On May 24, Navient informed Plaintiff that the Income Sensitive Plan would come to an end in 60 days, but that she would be able to renew her participation in the plan, allowing her to pay $388.65 per month. Plaintiff submitted her application to renew her participation in the plan, but Navient deemed the application incomplete. Navient informed Debtor that as of July 26, 2015, her loan balance had reached $60,148.10 with monthly payments of $635.66.

On August 27, 2015, Plaintiff applied for, and was approved for, an Income-Based Repayment ("IBR") plan through August 24, 2016. Under an IBR plan, the repayment obligation

of the borrower is calculated as 15% of discretionary income that the borrower earns greater than 150% of the Illinois poverty line ($18,210 in 2018). If the borrower remains on the IBR plan for 25 years, the debt will be forgiven. Borrowers on IBR plans are required to submit information about their annual income so that the IBR payments may be calculated. Plaintiff's IBR payment was $249.11 per month. She made one payment of $149.11 on September 23, 2015 and one payment of $149.00 on October 19, 2015.

During the entirety of this period, Plaintiff's student loan continued to accrue interest, and at no point did the balance owed on the loan fall below the initial $30,051.83 principal balance at the time of consolidation.

## II. Plaintiff's Bankruptcy Petition

Plaintiff filed her petition for Chapter 7 bankruptcy relief *pro se* on November 9, 2015. Her case was closed on March 7, 2016 and she did not receive a discharge because she failed to submit her Certification About a Financial Management Course. On April 1, 2016, Navient notified Plaintiff that her loan balanced had reached $60,569.67 and that her monthly payments had increased to $734.88. Navient again reached out to Plaintiff on June 9, 2016 indicating that the loan balance had reached $64,759.84.

Plaintiff moved to reopen her bankruptcy case on April 10, 2017 in order to file the instant adversary against Navient, seeking to determine the dischargeability of her student loan pursuant to 11 U.S.C. § 523(a)(8). Plaintiff filed the instant adversary proceeding *pro se* that same date, identifying Navient as the defendant. That motion was granted on April 20, 2017, and Plaintiff was subsequently granted a discharge. Excluding the student loan, Plaintiff's discharged debts totaled $145,485.00. Plaintiff's main bankruptcy case was closed on April 25, 2017. Navient filed its proof of claim for $68,702.01 on April 28, 2017.

Great Lakes Higher Education Guaranty Corporation, the assigned holder of Plaintiff's consolidated student loan, assigned the loan to Educational Credit Management Corporation ("ECMC"), an agency which guarantees federally-backed student loans against default and is in turn reinsured by the United States of America. 20 U.S.C. §§1085(j), 1078(c). ECMC is obligated to pursue and collect student loans pursuant to regulations issued by the Department of Education. 20 U.S.C. § 1071, et seq.; 34 C.F.R. 682.410 et seq. Additionally, ECMC is a specialized guarantor which accepts transfer of title to student loans when the borrower files for bankruptcy. ECMC, as the only entity which holds any right, title or interest in Plaintiff's student

loan, intervened as the proper defendant in the instant adversary. As of January 16, 2018, ECMC calculated the loan balance to be $72,674.72. The most recent monthly payment amount for a non-income sensitive plan is $734.88 per month.

### III. Plaintiff's Finances and Circumstances

As reported to her by the U.S. Social Security Administration, over her work life Plaintiff had the following earnings (not including unemployment compensation but including contract income in 2012 not appearing on Social Security Administration report):

| Year | Earnings |
|------|----------|
| 1991 | $ 19,317 |
| 1992 | $ 9,007 |
| 1993 | $ 11,633 |
| 1994 | $ 26,105 |
| 1995 | $ 19,793 |
| 1996 | $ 29,850 |
| 1997 | $ 43,166 |
| 1998 | $ 44,500 |
| 1999 | $ 48,500 |
| 2000 | $ 58,000 |
| 2001 | $ 37,643 |
| 2002 | $ 45,596 |
| 2003 | $ 44,738 |
| 2004 | $ 13,090 |
| 2005 | $ 4,170 |
| 2006 | $ 46,264 |
| 2007 | $ 75,543 |
| 2008 | $ 88,357 |
| 2009 | $ 1,755 |
| 2010 | $ 8,232 |
| 2011 | $ - |
| 2012 | $ 27,125 |
| 2013 | $ 31,097 |
| 2014 | $ 43,824 |
| 2015 | $ 58,342 |
| 2016 | $ 57,908 |
| 2017 | $ 63,036 |

Plaintiff currently works from home as a Marketing Specialist for Government Payment Service, Inc. In 2017, she earned $63,036, including a one-time bonus of $5,000.00 resulting from the sale of the company. Excluding the 2017 bonus, Plaintiff earns approximately $60,000 per year at her current job. Plaintiff has no investment income. She received $20,000 as an inheritance in 2012, but does not expect to receive any additional money through any inheritance. Plaintiff has continued to work for Government Payment Service, Inc. under new management, but has been informed that the continuation of her employment is uncertain.

Plaintiff maintains a LinkedIn web page in order to advertise her skills and experience for prospective employers. Plaintiff has applied for eight positions through the website since 2010 and none have resulted in employment offers.

Plaintiff presented a *pro forma* budget as one of her exhibits, which was admitted over objection, except for the line estimating Plaintiff's monthly rent. (Pl.'s Exh. 65.) She testified at trial that she paid between $1,000 and $1,750 to her ex-husband each month for rent, the amount not being fixed each month as Plaintiff was allowed to offset expenditures she personally made at Home Depot against the amount owed as rent each month. Plaintiff also testified that she will soon have to move because her ex-husband plans to sell the building she currently lives in and projects her new rent to be approximately $1,750 per month.

Additionally, Plaintiff testified that she owned two vehicles, a 2007 Jeep Grand Cherokee and a 2015 Jeep Grand Cherokee. The 2007 Jeep is paid off, but Plaintiff is currently paying $329 per month on the 2015 vehicle, with the payment plan set to run through May of 2023. Plaintiff drives the 2007 Jeep Grand Cherokee and her daughter drives the 2015 Jeep Grand Cherokee. Plaintiff pays $272.85 per month in insurance for both herself and her daughter's vehicles. She spends approximately $150 per month on gas and maintenance on the two vehicles, but testified at trial that the 2007 Jeep Grand Cherokee was not a reliable vehicle.

Plaintiff testified at trial that the rest of her monthly income is spent on living expenses, including food, utilities, recreation, and uninsured health expenses. Plaintiff states that she has deferred dental work that she needs but cannot currently afford and that she does not save for retirement.

## CONCLUSIONS OF LAW

The purpose of the discharge provided by the Bankruptcy Code is to provide honest, but unfortunate debtors with a financial, "fresh start." *In re. Chambers*, 348 F.3d 650, 653 (7th Cir.

8

2003). However, not all debts are included in the general bankruptcy discharge. The Bankruptcy Code lists specific, limited circumstances in which debts are excluded from the general discharge in 11 U.S.C. § 523. Student loans are one such type of debt and are presumptively non-dischargeable. 11 U.S.C. § 523(a)(8); *In re Hanson*, 397 F.3d 482, 484 (7th Cir. 2005). A debtor can overcome this presumption of non-dischargeability with a showing that excepting the student loans from the general discharge would impose an undue hardship on the debtor and his or her dependents. *Hanson*, 397 F.3d at 484.

In evaluating whether non-dischargeability of student loans imposes an undue hardship upon a debtor, the Seventh Circuit has adopted the Second Circuit's *Brunner* test. *In re Roberson*, 999 F.2d 1132, 1135 (7th Cir. 1993) (citing *Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395 (2d Cir. 1987)). Under the *Brunner* test, a debtor must establish three elements to properly claim undue hardship: (1) the debtor cannot, based on current income and expenses, maintain a "minimal" standard of living for him or herself and his or her dependents if required to repay the student loans, (2) that additional circumstances exist which indicate that this state of affairs is likely to persist for a significant portion of the repayment period, and (3) that the debtor has made a good faith effort to repay the loans. *Id.* Although the Bankruptcy Code itself does not refer to "undue hardship," courts have interpreted the statutory language of 11 U.S.C. § 523(a)(8) as suggesting that the hardship must be more than the "garden-variety" that is present in all bankruptcy filings. *O'Hearn v. Educ. Credit Mgmt. Corp. (In re O'Hearn)*, 339 F.3d 559, 564 (7th Cir. 2003). Debtors bear the burden of proving each of the elements of the *Brunner* test. *Goulet v. Educ. Credit Mgmt. Corp.*, 284 F.3d 773, 777 (7th Cir. 2002) (citing *Grogan v. Garner*, 498 U.S. 279, 291 (1991)). If a debtor fails to establish one of these elements, she has failed to meet her burden and the court need not inquire further. *Id.*

### A. Minimal Standard of Living

The application of the *Brunner* test begins with an analysis of whether the debtor in question could maintain a minimal standard of living if he or she is required to pay back her debts. The debtor does not need to live a life of poverty to pay back his or her student loans, but if he or she is required to do so, then the debtor is required to make, "major personal and financial sacrifices and to live within a restricted budget." *Larson v. United States (In re Larson)*, 426 B.R. 782, 789 (Bankr. N.D. Ill. 2010) (quoting *Clark v. U.S. Dep't of Educ. (In re Clark)*,

341 B.R. 238, 249 (Bankr. N.D. Ill. 2006)). Of particular relevance is the question of whether the debtor is maximizing his or her personal income, while minimizing current living expenses. *Id.*

The central dispute between the parties is the application of the first prong of the *Brunner* test to the facts at bar. Plaintiff testified that her net monthly pay is approximately $3,674.00. (*See also* Exh. 65.) Her job is currently her only source of income. Plaintiff has argued that based on her income and current expenses, including projected expenses such as her estimated rent payments, she cannot afford the $734.88 monthly student loan payments. (Tr. 17:15-22.) Plaintiff also argued that even were she able to enter into a repayment plan, reducing her monthly student loan payments to approximately $348, there would still be no room in the budget to allow her to make these student loan payments without incurring undue hardship. (Tr. 23:5-15.) Plaintiff testified to the fact that her job situation is precarious, and that while she has made an effort to search for other work, she is unlikely to substantially increase her earning capacity at this point in her career, and she believes the cloud of her former employer has made it difficult to find other employment. (Tr. 34:2-13.)

Plaintiff has failed to show that she will be unable to maintain a minimal standard of living should she be required to pay back her student loan. While it is likely that Plaintiff has maximized her income at this stage of her career, she is bringing home $3,674.00 per month. Many debtors seeking relief from bankruptcy find themselves in straits far direr than Plaintiff's. Moreover, while Plaintiff testified that she is fearful that her company will let her go in the near future, the possibility of unemployment is not unique to her, and it is a challenge that many bankrupt debtors face. Additionally, she did not establish by way of her exhibits or her trial testimony anything supporting her conclusion that because of her previous employment with LandAmerica Financial Group (a real estate title insurance company that filed for Chapter 11 resulting from the collapse of its operation of a potential Ponzi scheme), that the very fact of her employment there diminished her chances at future employment. While Plaintiff did state that she had applied for approximately eight to ten jobs through LinkedIn over the past several years, the type, quality, and salary of those positions is unknown. (Tr. 59:12-18.) Moreover, if Plaintiff truly is faced with the prospect of imminent unemployment, eight to ten job applications is a not an immense number. Debtors are expected to cast a wide net to maximize their income and, "it is not uncommon for individuals to take jobs not to their liking in order to pay off their student

loans, or for that matter to meet all sorts of other financial obligations." *O'Hearn*, 339 F.3d at 566.

Plaintiff has also failed to show that she is minimizing her current expenses. She estimates that she will be paying more than $1,500 per month once she moves to a new apartment. But, the *Brunner* test does not deal with hypothetical, future expenses. The analysis is based on a debtor's current expenses. *Roberson*, 999 F.2d at 1135. Plaintiff's current rent expenditures are not entirely clear. She testified that she would pay her ex-husband approximately $1,500.00 per month, but that amount was frequently offset by expenditures at Home Depot. The actual amount that Plaintiff pays for rent each month is likely above $600.00 per month, but certainly below the $1,500.00 or $1,750.00 figure that Plaintiff contends she owes.

Plaintiff also pays for insurance and monthly car payments for a 2015 Jeep Grand Cherokee that, by her own admission at trial, she does not drive. (Tr. 50:14-20.) Plaintiff works from home, but her adult daughter, currently enrolled in college, is the one who uses the 2015 Jeep as transportation. She also testified that she sought to obtain the second vehicle in order repair her credit. (Tr. 45:7-14.) Plaintiff pays nearly $700 per month on the monthly car payment, insurance, and gas and maintenance on her two vehicles. (Pl.'s Exh. 65.) Plaintiff has a 2007 Jeep Grand Cherokee that is already paid off. While she did testify that the 2007 vehicle is not entirely reliable, that is a challenge that many debtors manage to overcome. Plaintiff is not entitled to simply assert that the 2015 Jeep and its commensurate expenses are necessary when the evidence presented at trial and her own testimony does not prove that.

Finally, it is worth noting that the $734.88 monthly student loan payments can be reduced. Although it is not clear that Plaintiff is currently eligible for some form of repayment plan, should she complete the necessary requirements, her payments could be reduced to anywhere between $230 and $588 per month, depending on the type of repayment plan she enters into. (Tr. 58:13-15.) While the mere availability of an income sensitive or income based repayment plan does not defeat a claim of undue hardship, it is a factor that courts may consider in their analysis. *Krieger v. Educ. Credit Mgmt. Corp.*, 713 F.3d 882, 884 (7th Cir. 2013). Here, should Plaintiff attempt to reconsolidate her loan and enter into an income sensitive plan for repayment of her student loan, she could substantially lower her monthly payments. Then, if she

were to meaningfully minimize her expenses, there is no reason to believe that she will be categorically unable to maintain a minimal standard of living while paying back her student loan.

Based on the evidence regarding Plaintiff's income and expenses, it is clear that she has failed to prove by a preponderance of the evidence that she would be unable to maintain more than a minimal standard of living if she were required to repay her student loan. Plaintiff has not met her burden with regards to the first prong of the *Brunner* test.

### B. Additional Circumstances

While the finding that Plaintiff has failed to meet her burden with regards to the first prong of the *Brunner* test alone renders her student loan debt non-dischargeable, it is worthwhile examining her case under the remaining two prongs.

The second prong of the *Brunner* test asks whether additional circumstances are present that evince a debtor's inability to pay is likely to persist for a significant portion of the repayment period. *Tetzlaff v. Educ. Credit Mgmt. Corp.*, 794 F.3d 756, 759 (7th Cir. 2015) (citations omitted). The debtor's "certainty of hopelessness" must exist for a significant portion of the repayment period, rather than just being a current inability to make payments. *Goulet v. Educ. Credit Mgmt. Corp.*, 284 F.3d 773, 777 (7th Cir.2002) (quoting *Roberson*, 999 F.2d at 1135-36). In order to demonstrate that a "certainty of hopelessness" is likely to persist, a debtor must concretely identify his or her particular problems and explain how those problems will impair his or her ability to work in the future. *In re Cavender*, 2017 WL 8218841 (Bankr. N.D. Ill. Nov. 27, 2017) (citing *In re Vargas*, No. 10 C 4022, 2010 WL 5395142, *5 (C.D. Ill. Dec. 23, 2010)). This standard is very difficult to meet and generally only debtors who are severely disabled, have psychiatric issues, have no usable job skills, or have very limited education are able to show that their inability to pay for the entire period is a, "matter of fact rather than speculation." *Carter v. Sallie Mae (In re Carter)*, 517 B.R. 870, 876 (Bankr. N.D. Ill. 2014).

Plaintiff has not shown that her inability to pay will persist during the entire repayment period of her loan. As discussed earlier, her current inability to pay appears to be based solely on not minimizing her living expenses. She has a college education that has allowed her to secure employment earning, at times, over $60,000.00 per year. Apart from some dental work that she has had to put off, Plaintiff presented no evidence that she is anything but an otherwise healthy 51-year-old woman.

Plaintiff's age is also not particularly relevant to the question of whether her circumstances represent a "certainty of hopelessness." "Retirement age cannot be a dispositive factor," in the analysis of a court applying the *Brunner* test. *Cavender*, 2010 WL 5395142 at *7; *see also Rosen v. A.R.D.C., et al. (In re Rosen)*, Bankr. Case No. 15-bk-08971, Adv. Case No. 15-ap-00382, Dkt. No. 59 at p. 9 (Nov. 1, 2016), aff'd *Rosen v. A.R.D.C.*, No. 16 C 10686, 2017 WL 4340167 (N.D. Ill. Sept. 29, 2017) ("[T]he possibility that the Plaintiff will not live until the end of the repayment period is not a factor that the Court must consider in applying the *Brunner* test."); *Kehler v. Nelnet Loan Servs. (In re Kehler)*, 326 B.R. 142, 148 (Bankr. N.D. Ind. 2005) (finding that for a 62-year-old debtor, a 25-year repayment period was reasonable).

The only unusual fact in this case is Plaintiff's testimony that her association with her previous employer, LandAmerica Financial Group, and its eventual Chapter 11 bankruptcy filing as a result of its shady business operations, has impacted her ability to secure other employment. However, Plaintiff testified that she has only applied to eight to ten jobs despite her belief that her current employment may come to an end soon. (Tr. 59:12-18.) Plaintiff produced no evidence of causation linking her allegedly tarnished reputation as a result of her employment with LandAmerica and her lack of offers from employers to which she submitted applications. Moreover, while Plaintiff testified that her discussions with headhunters and recruiters have been fruitless because they see that her credit score has suffered as a result of filing for bankruptcy, this is a circumstance that is true of all debtors who file for bankruptcy and is in no way unique to Plaintiff. (Tr. 59:18-25; 60:1-4.)

In light of the totality of Plaintiff's personal and financial circumstances, her testimony and the evidence produced at trial do not establish that her inability to meet her financial obligations is caused by additional circumstances likely to persist for the remainder of the repayment period. Plaintiff has thus failed to establish a "certainty of hopelessness" as required by the Seventh Circuit and has thus failed to meet her burden under the second prong of the *Brunner* test.

### C. Good Faith Efforts to Repay

The final prong of the *Brunner* test asks whether the debtor has demonstrated that he or she has "made good faith efforts to repay the loans." *Roberson*, 999 F.2d at 1135. "[U]ndue hardship encompasses a notion that the debtor may not willfully or negligently cause his own default, but rather his condition must result from 'factors beyond his reasonable control.' *Id.*

13

(quoting COMM'N ON THE BANKRUPTCY LAWS OF THE UNITED STATES, REPORT, H.R. DOC. NO. 93-137, pt. II at 140, n. 15 (1st Sess. 1973)).

Plaintiff's long payment history is detailed both in the Joint Stipulation of Facts submitted by the parties and above in this Court's Findings of Fact. While Plaintiff has sought and received several forbearances on her student loan as a result of periods of unemployment or other financial difficulty, by the time she filed for Chapter 7 bankruptcy relief in November 2015, Plaintiff had paid $29,122.25 on the loan consolidated in 1997. That is more than the principal amount, so it is clear that Plaintiff's difficulties result from the interest accrued during the periods of time during which she was unable to make payments on the loan and received forbearances or deferrals. While Plaintiff's loan balance has continued to accrue, she has clearly established that she has made a good faith effort to repay the student loan, and has thus satisfied her burden under the third prong of the *Brunner* test.

However, because she was unable to satisfy the first two prongs of the *Brunner* test, her claim of undue hardship is nonetheless defeated, despite her good faith efforts to repay the loan.

## CONCLUSION

Plaintiff, like so many other debtors, sought relief from the crushing burden of student loan debt, a financial obstacle that is proving to be a pervasive and concerning long-term reality for many people in the United States. Bound as this Bankruptcy Court is by Seventh Circuit precedent and the *Brunner* test, such debtors face an uphill battle for relief from their student loans in the Seventh Circuit. As articulated above, Plaintiff has failed to satisfy her burden under the first two prongs of the *Brunner* test, and her student loan debt must thus be deemed non-dischargeable pursuant to 11 U.S.C. § 523(a)(8).

This Court would like to thank Mr. William J. Barrett of Barack Ferrazzano Kirschbaum & Nagelberg LLP for volunteering his time and expertise as counsel for Plaintiff in this adversary proceeding. Although he could not overcome Seventh Circuit precedent to result in the discharge of his client's student loan debt, he advocated zealously on her behalf and assisted this Court greatly with regards to conducting a trial and ruling on the factual and legal issues before it.

A separate Judgment will be entered deeming Plaintiff's debt to Educational Credit Management Corporation non-dischargeable pursuant to 11 U.S.C. § 523(a)(8).

ENTER:

Jack B. Schmetterer
United States Bankruptcy Judge

Dated this 26th day of July, 2018