# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

In re:

Laurina Kim Bukovics,

                              Debtor.

Chapter 7
Bankruptcy No. 15 BK 38069
Honorable Judge Jack B. Schmetterer

Laurina Kim Bukovics,

                              Plaintiff,

                    v.

Navient,

                              Defendant.

Adversary No. 17 AP 00186

## MEMORANDUM DECISION
### PREFACE

The crushing burden of student loan debt is proving to be a financial obstacle and a pervasive and concerning long-term reality for many people in the United States. Many individuals consider college degrees a necessity due to the large increases in earning potential they can offer.[1] However, over the past three decades, the cost of college attendance has seen drastic changes. In that time frame, the average tuition has soared by nearly 370% from around $4,885 to $23,091.[2]

This rising cost of tuition is leading to subsequent increases in borrowing and indebtedness for students. In 1992-1993, the average student loan debt for bachelor's degree graduates totaled $9,320.[3] In 2017-2018, that average jumped to $29,812.[4] With the ever-growing level of debt, three-fourths of students' families are now having to pay more than 20% of their annual income towards higher education.[5] For low-income families making less than $16,000 per year, that

---

[1] Suvy Quin, Christian Jones, *Is College Still Worth It,* Federal Reserve Bank of St. Louis (July 9th, 2019), https://fredblog.stlouisfed.org/2018/07/is-college-still-worth-it/.
[2] *Tuition Costs of Colleges and Universities,* National Center for Education Statistics (February 21, 2020), https://nces.ed.gov/fastfacts/display.asp?id=76.
[3] Mark Kantrowitz, *Trends in Student Loan Debt,* Financial Planning Association (February 21, 2020), https://www.onefpa.org/journal/Pages/FEB19-Trends-in-Student-Loan-Debt.aspx.
[4] *Id.*
[5] Kate Sablosky Elengold, *The Investment Imperative*, 57 Hous. L. Rev. 1, 21 (2019).

percentage is 80%.[6] In turn, the U.S. cumulative student debt load has ballooned to over $1.51 trillion at the end of 2019.[7]

Normally, relief from crushing debt can be sought through bankruptcy, which generally provides for a discharge of all debts.[8] Indeed, the purpose of the discharge provided by the Bankruptcy Code is to provide honest, but unfortunate debtors with a financial, "fresh start."[9] However, the Bankruptcy Code enumerates specific, limited circumstances in which certain debts are excluded from the general discharge.[10] As originally enacted, student loans were dischargeable under the Code. Since then, the Code has been amended to include the exception to the student loan discharge.[11] Generally, all student loans are now excepted from discharge unless "undue hardship" can be demonstrated.[12] Under the standard adopted in this Circuit, debtors face an uphill battle for relief from their student loans through the difficult-to-meet *Brunner* test to determine "undue hardship."

## INTRODUCTION

Plaintiff-debtor Laurina Kim Bukovics ("Plaintiff") brought this action seeking a declaration that her student loan debt owed to Educational Credit Management Corporation ("Defendant")[13] is dischargeable under Section 523(a)(8) of Title 11 of the United States Code. Previously, Findings of Fact and Conclusions of Law were entered, and a Judgment Order was issued determining the debt non-dischargeable. Plaintiff then moved for relief from judgment on the basis of new evidence. Judgment was reopened and new evidence was presented.

For reasons articulated below, which constitute the Court's amended Findings of Fact and Conclusions of Law, it is held that Plaintiff has sufficiently met her burden to demonstrate that repayment of her student loan debt would constitute an "undue hardship" under 11 U.S.C. § 523(a)(8). A corresponding amended Judgment Order will be entered concurrently herewith discharging the student loan debt through her bankruptcy.

---

[6] *Id.*

[7] Household Debt and Credit Report (Q4 2019), Federal Reserve Bank of New York (February 12, 2019), https://www.newyorkfed.org/microeconomics/hhdc.html.

[8] *See* 11 U.S.C. § 727(b).

[9] *Grogan v. Garner*, 498 U.S. 279, 286–87 (1991).

[10] 11 U.S.C. § 523.

[11] 11 U.S.C. § 523(a)(8).

[12] *Id.*

[13] Plaintiff filed the adversary against Navient. ECMC later intervened as the proper party defendant. [Dkt. No. 7].

## JURISDICTION

Subject matter jurisdiction lies under 28 U.S.C. § 1334. The district court may refer bankruptcy proceedings to a bankruptcy judge under 28 U.S.C. § 157 and 28 U.S.C. § 1334, and this proceeding was thereby referred here by Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. Venue lies under 28 U.S.C. § 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). "A bankruptcy judge has constitutional authority to enter final judgment as to dischargeability." *In re Monarrez*, 588 B.R. 838, 845 (Bankr. N.D. Ill. 2018) (Barnes, T.); *see also Stern v. Marshall*, 564 U.S. 462 (2011) (matters of nondischargeability stems from the bankruptcy itself).

## FINDINGS OF FACT[14]

A. Plaintiff's History and Financial Circumstances

1. Plaintiff is an Illinois resident who was born in 1967.

2. In the fall of 1985, Debtor enrolled as a freshman at the University of Wisconsin.

3. In August of 1990, Plaintiff graduated with a degree in Communications from the University of Wisconsin.

4. During her time there, Plaintiff received thirteen separate student loans, consisting of nine Stafford Subsidized loans, two Federal Supplemental Loans for Students, and two Perkins Loans. At no point did Plaintiff take out any private student loans.

5. In November of 2008, Debtor's then employer, LandAmerica, ceased operating and filed for bankruptcy.

6. Plaintiff began receiving unemployment payments of $523 a week in late December of 2008.

7. In 2010, Plaintiff remained unemployed apart from two months of contract employment with Nielsen, during which she earned $8,232. Plaintiff's only other source of income was unemployment compensation, of which she received $534.00 per week during the most of 2010.

8. Plaintiff was unemployed during the entirety of 2011. At some point during 2011, Plaintiff's unemployment compensation ceased. Plaintiff had no other earnings in 2011.

---

[14] The Findings of Fact are drawn from the docket, the parties' Joint Findings of Fact [Dkt. No. 35], and the testimony and evidence presented and admitted at trial.

3

9. Plaintiff began to receive some part-time contract work in mid-2012 as a contractor for
Government Payment Service, Inc.

10. It was not until early 2013 that Plaintiff became regularly employed, this time as a
marketing specialist at a salary of $31,097.

11. Plaintiff's employment continued until it was terminated on June 24, 2018. In return,
Plaintiff received two weeks of severance pay.

12. In sum, as reported to her by the U.S. Social Security Administration, over her work
life through 2017, Plaintiff had the following earnings (not including unemployment
compensation, but including contract income in 2012 not appearing on the Social
Security Administration report):

| | | |
|------|---|--------|
| 1991 | $ | 19,317 |
| 1992 | $ | 9,007  |
| 1993 | $ | 11,633 |
| 1994 | $ | 26,105 |
| 1995 | $ | 19,793 |
| 1996 | $ | 29,850 |
| 1997 | $ | 43,166 |
| 1998 | $ | 44,500 |
| 1999 | $ | 48,500 |
| 2000 | $ | 58,000 |
| 2001 | $ | 37,643 |
| 2002 | $ | 45,596 |
| 2003 | $ | 44,738 |
| 2004 | $ | 13,090 |
| 2005 | $ | 4,170  |
| 2006 | $ | 46,264 |
| 2007 | $ | 75,543 |
| 2008 | $ | 88,357 |
| 2009 | $ | 1,755  |
| 2010 | $ | 8,232  |
| 2011 | $ | -      |
| 2012 | $ | 27,125 |
| 2013 | $ | 31,097 |
| 2014 | $ | 43,824 |
| 2015 | $ | 58,342 |
| 2016 | $ | 57,908 |

4

2017    $    63,036

13. Plaintiff has no investment income.

14. She received $20,000 as an inheritance in 2012, but does not expect to receive any additional money through any inheritance, will, trust, or estate plan.

B. Loans and Repayment History

15. Plaintiff's student loans, as originally received, totaled $20,896.00 and accrued interest at rates between 5% to 8%.

16. The required repayment period of Plaintiff's loans began on February 15, 1991.

17. From 1991 to 1997, Plaintiff made some payments on her loans, but record of payments made during that period no longer exist. At times during this period, the loans were put in forbearance and Plaintiff was excused from making payments.

18. Plaintiff defaulted on the two Perkins loans on March 2, 1992.

19. In April of 1997, Plaintiff applied to SallieMae, the then loan servicer, to consolidate all of her student loans into one. To be eligible for such a program, Plaintiff had to make three voluntary, consecutive, and timely loan payments.

20. On June 17, 1997, Plaintiff's application for consolidation of her loans was approved.

21. The consolidated principal of the loan balance at that time was $30,051.83 with interest accruing at a rate of 8%. Plaintiff was to make payments over 20 years with periodic increases in the monthly amount. The initial payments were set at $208.71.

22. For the period of July 31, 1997 through July 1999, Debtor applied for and received forbearance from the payments due on her student loan. No payments were made during this period, but interest continued to accrue and was capitalized to the loan balance.

23. As of July 14, 1998, the balance owed on the loan was $32,377.67.

24. As of January 25, 1999, the balance owed on the loan was $35,675.45.

25. From August 1999 through August 2000, Debtor made 13 consecutive monthly loan payments of $233.38 each.

26. From August 27, 2000 through August 2001, Debtor applied for and received forbearance from payments due on her student loan.

27. From September of 2001 through March of 2004, Debtor made 29 loan payments of $252.87 each (except that two of the payments were short by $4.83).

28. In June of 2004, Debtor made one payment of $255.

29. There is no record of forbearance or payment for the months of April and May of 2004.

30. On July 25, 2004, Debtor applied for and received forbearance from payments through January of 2005.

31. From March of 2005 through September of 2008, Debtor made 44 payments on her loan, ranging between $111.94 and $685.92, with an average payment of $360.

32. On November 30, 2008, due to her unemployment then, Debtor submitted a request to SallieMae for an Unemployment Deferment. While that request was pending, Plaintiff made two payments on her loan, a $400 payment on December 2, 2008 and a $373.90 payment on January 5, 2009.

33. As of January 5, 2009, Plaintiff had paid $28,346.76 on the consolidated student loan since June 17, 1997.

34. On January 23, 2009, Plaintiff inquired on the status of her request for Unemployment Deferment. SallieMae responded that Plaintiff needed to submit additional documentation supporting her request.

35. On February 1, 2009, Plaintiff's request for Unemployment Deferment was approved through May of 2009. During this period, Plaintiff made one payment of $30. Interest continued to accrue during the deferment period.

36. On June 12, 2009, SallieMae informed Plaintiff that her loan balance had reached $37,610.19.

37. By October 12, 2009, the loan balance had reached $38,541.05.

38. On February 8, 2010, Plaintiff contacted SallieMae regarding repayment options. SallieMae granted forbearance retroactive to November 2009, and Plaintiff made one payment of $48.20 during this period.

39. By April 9, 2010, SallieMae notified Plaintiff that the current loan balance was $40,072.

40. On November 11, 2010, the loan balance had reached $41,904.72 and SallieMae indicated that the monthly payment amount would increase to $440.24 once payments resumed.

41. On January 4, 2011, Plaintiff again contacted SallieMae regarding repayment options. SallieMae notified Plaintiff that the request for unemployment deferment could not be

granted because payments had already been postponed for the maximum time allowed for unemployment. SallieMae advised Plaintiff of other payment options.

42. On January 5, 2011, Debtor applied for and received forbearance from payments due from January of 2011 through June of 2011 (later extended through May of 2013). No payments were made during this period.

43. On October 5, 2011, SallieMae notified Plaintiff that her loan balance had reached $47,228.07.

44. SallieMae notified Debtor that the balance remained at $47,228.07 on May 12, 2012, and also stated that the payments would increase again to $498.90 once the forbearance period ended.

45. SallieMae contacted Plaintiff on May 10, 2013 and indicated that her loan balance had reached $51,119.47, and that the monthly payments had increased to $540.01.

46. In order to reduce these payments, Plaintiff contacted SallieMae on November 20, 2013 and applied for an Economic Hardship Deferment. SallieMae informed Plaintiff shortly thereafter that additional information would be required for her request.

47. Between June of 2013 and January of 2014, SallieMae granted Plaintiff forbearance.

48. On December 27, 2013, Plaintiff was notified that her loan balance had reached $53,566.10 and that her monthly payments would increase to $565.87.

49. Plaintiff again applied for an Economic Hardship Deferment on March 25, 2014, but was notified that the application could not be processed because it was incomplete.

50. On April 2, 2014, SallieMae informed Plaintiff of alternative payment plans including Income Based Repayment.

51. On April 30, 2014, Navient took over responsibility for servicing Plaintiff's loan.

52. Navient contacted Plaintiff on June 1, 2014, informing her that the principal of her loan balance had reached $54,348.21.

53. Plaintiff applied for an Income Sensitive Repayment Plan on July 21, 2014.

54. That application was granted on July 31, 2014, allowing her to pay only $79.20 for five months.

55. Plaintiff applied for and received forbearance of payments on September 3, 2014.

56. On November 25, 2014, Navient informed Plaintiff that her loan balance had reached $57,195.84.

7

57. On March 19, 2015, Navient informed her that the balance had risen to $58,355.36.

58. Plaintiff applied for and received entry into an Income Sensitive Repayment Plan on March 22, 2015, effective through July of 2015.

59. Between March of 2015 and October of 2015, Plaintiff made six payments totaling $697.29.

60. By this time, Plaintiff had paid $29,122.25 on the loan consolidated in 1997.

61. On May 24, 2015, Navient informed Plaintiff that the Income Sensitive Plan would come to an end in 60 days, but that she would be able to renew her participation in the plan, allowing her to pay $388.65 per month. Plaintiff submitted her application to renew her participation in the plan, but Navient deemed the application incomplete.

62. Navient informed Debtor that as of July 26, 2015, her loan balance had reached $60,148.10 with monthly payments of $635.66.

63. On August 27, 2015, Plaintiff applied for, and was approved for, an Income-Based Repayment ("IBR") plan through August 24, 2016.

64. Under an IBR plan, the repayment obligation of the borrower is calculated as 15% of discretionary income that the borrower earns greater than 150% of the Illinois poverty line ($18,735 in 2019). If the borrower remains on the IBR plan for 25 years, the debt will be forgiven. Borrowers on IBR plans are required to submit information about their annual income so that the IBR payments may be calculated.

65. Plaintiff's IBR payment was $249.11 per month.

66. Plaintiff made one payment of $149.11 on September 23, 2015 and one payment of $149.00 on October 19, 2015.

67. During the entirety of this period, Plaintiff's student loan continued to accrue interest, and at no point did the balance owed on the loan fall below the initial $30,051.83 principal balance at the time of consolidation.

68. In sum, from July 1997 through 2015, Plaintiff made the following payments on the consolidated student loan:

| Dates | Payments | Reason |
|---|---|---|
| July 1997 – June 1999 | $0 | forbearance |
| August 1999 – August 2000 | 13 payments of $233.38 | |
| August 2000 – August 2001 | $0 | forbearance |

8

| September 2001 – March 2004 | 29 payments of $252.87 (2 payments short by $4.83) | |
| April 2004 – May 2004 | $0 | |
| June 2004 | 1 payment of $255 | |
| July 2004 – January 2005 | $0 | forbearance |
| March 2005 – September 2008 | 44 payments, ranging between $111.94 and $685.92; average payment of $360 | |
| October 2008 – November 2008 | $0 | |
| December 2008 | 1 payment of $400 | |
| January 2009 | 1 payment of $373.90 | |
| February 2009 – May 2009 | $0 | deferment |
| March 2009 | 1 payment of $30 | |
| June 2009 – July 2009 | $0 | |
| August 2009 – November 2009 | $0 | deferment |
| November 2009 – May 2010 | $0 | forbearance |
| March 2010 | 1 payment of $48.20 | |
| June 2010 – November 2010 | $0 | possible deferment |
| December 2010 | $0 | |
| January 2011 – June 2011 | $0 | forbearance |
| July 2011 – September 2011 | $0 | |
| October 2011 – August 2013 | $0 | forbearance |
| September 2013 – December 2013 | $0 | |
| January 2014 – February 2014 | $0 | forbearance |
| March 2015 – October 2015 | 6 payments; average payment amount is $116. | |

C.  The Bankruptcy Petition and Events Post Bankruptcy

69. Plaintiff filed her petition for Chapter 7 bankruptcy relief *pro se* on November 9, 2015.

70. Her case was closed on March 7, 2016 and she did not receive a discharge because she failed to submit her Certification About a Financial Management Course.

71. On April 1, 2016, Navient notified Plaintiff that her loan balance had reached $60,569.67 and that her monthly payments had increased to $734.88.

72. Navient again reached out to Plaintiff on June 9, 2016 indicating that the loan balance had reached $64,759.84.

73. On April 10, 2017, Plaintiff moved to reopen her bankruptcy case.

74. Plaintiff filed the instant adversary proceeding *pro se* on April 10, 2017 as well, identifying Navient as the defendant.

75. Plaintiff's motion to reopen her bankruptcy case was granted on April 20, 2017, and Plaintiff was subsequently granted a discharge. Excluding the student loan, Plaintiff's discharged debts totaled $145,484.67.

76. Plaintiff's main bankruptcy case was closed on April 25, 2017.

77. Navient filed its proof of claim for $68,702.01 on April 28, 2017.

78. Great Lakes Higher Education Guaranty Corporation, the-then assigned holder of Plaintiff's consolidated student loan, assigned the loan to Defendant, an agency which guarantees federally-backed student loans against default and is in turn reinsured by the United States of America.[15]

79. Defendant is obligated to pursue and collect student loans pursuant to regulations issued by the Department of Education.[16] Additionally, Defendant is a specialized guarantor which accepts transfer of title to student loans when the borrower files for bankruptcy.

80. Defendant, as the only entity which holds any right, title or interest in Plaintiff's student loan, intervened on May 18, 2017 as the proper defendant in the instant adversary.

81. As of January 16, 2018, Defendant calculated the loan balance to be $72,674.72.

82. Trial was held in May of 2018 on Plaintiff's Complaint.

83. On July 26, 2018, Findings of Fact and Conclusions of Law were entered holding that Plaintiff failed to satisfy her burden under the first two prongs of the *Brunner* test to discharge her student loan. A corresponding Judgment Order was entered that day in favor of Defendant.

---

[15] *See* 20 U.S.C. §§1085(j), 1078(c).
[16] *See* 20 U.S.C. § 1071, et seq.; 34 C.F.R. 682.410 et seq.

84. On August 9, 2018, Plaintiff moved to alter and amend the judgment and findings of
    fact and conclusions of law on the basis of new evidence, the termination of Plaintiff's
    employment.

85. The motion to alter or amend was granted on August 17, 2018 and judgment was re-
    opened. New evidence was presented during the next few months.

86. On May 8, 2019, an Opinion was issued holding that Plaintiff met the first and third
    prong of the *Brunner* test. Ruling on the second prong was held in abeyance until
    October 1, 2019 for Plaintiff to present further evidence on her further efforts to seek
    employment.

87. Further evidence of Plaintiff's employment efforts was presented in October 31, 2019
    and the parties rested.

## CONCLUSIONS OF LAW[17]

Student loans are presumptively non-dischargeable. 11 U.S.C. § 523(a)(8); *In re Hanson*,
397 F.3d 482, 484 (7th Cir. 2005). A debtor can overcome this presumption of non-
dischargeability with a "affirmative showing that excepting the student loans from the general
discharge would impose an undue hardship on the debtor and his or her dependents." *Id.* The phrase
"undue hardship" is not defined in the Bankruptcy Code. Courts have interpreted the statutory
language of 11 U.S.C. § 523(a)(8) as suggesting that the hardship must be more than the "garden-
variety" that is present in all bankruptcy filings. *O'Hearn v. Educ. Credit Mgmt. Corp. (In re
O'Hearn)*, 339 F.3d 559, 564 (7th Cir. 2003).

In evaluating whether non-dischargeability of student loans imposes an undue hardship
upon a debtor, the Seventh Circuit has adopted the Second Circuit's *Brunner* test. *Matter of
Roberson*, 999 F.2d 1132, 1135 (7th Cir. 1993) (citing *Brunner v. New York State Higher Educ.
Servs. Corp.*, 831 F.2d 395 (2d Cir. 1987)). Under the *Brunner* test, a debtor must establish three
elements to prove undue hardship: (1) the debtor cannot, based on current income and expenses,
maintain a "minimal" standard of living for him or herself and his or her dependents if required to
repay the student loans; (2) additional circumstances exist which indicate that this state of affairs
is likely to persist for a significant portion of the repayment period; and (3) the debtor has made a
good faith effort to repay the loans. *Id.* The debtor bears the burden of proving each element by a
preponderance of the evidence. *O'Hearn*, 339 F.3d at 565. "Furthermore, undue hardship

---

[17] Findings contained in this "Conclusions of Law" section will stand as additional findings of fact.

encompasses a notion that the debtor may not willfully or negligently cause his own default, but rather his condition must result from 'factors beyond his reasonable control.'" *Roberson*, 999 F.2d at 1136 (quoting Comm'n on the Bankruptcy Laws of the United States, Report, supra, Pt. II, at 140 n. 16).

## A. Plaintiff Cannot Maintain a Minimal Standard of Living

The application of the *Brunner* test begins with an analysis of whether the debtor in question could maintain a minimal standard of living if he or she is required to pay back her debts. This first element "serve[s] as the starting point . . . since information regarding the debtor's current financial situation generally will be concrete and readily obtainable." *Roberson*, 999 F.2d at 1135. Basically, the question is whether the debtor's present income and expenses allow for repayment. Of particular relevance is the question of whether the debtor is maximizing his or her personal income while minimizing current living expenses. *Clark v. U.S. Dep't of Educ. (In re Clark)*, 341 B.R. 238, 255 (Bankr. N.D. Ill. 2006).[18]

1. Plaintiff Has Attempted to Maximize Income

Plaintiff currently has no income. However, Plaintiff has certainly in good faith been attempting to find employment. It is uncontested that Plaintiff applied, in a sixteen month period, to over 200 part-time and full-time jobs, both in and out of her area of expertise.[19] Nonetheless, no present employment has materialized from her efforts.

Defendant argues that Plaintiff has failed to maximize her income as her job search is too narrow. Specifically, Defendant asserts that most of the jobs Plaintiff has applied to relate primarily to her professional job field. Essentially, Defendant's argument is of scope. For this, Defendant's argument is unpersuasive. Indeed, debtors are to "cast a wide net" while attempting to maximize their income. *O'Hearn*, 339 F.3d at 566 ("[I]t is not uncommon for individuals to take jobs not to their liking in order to pay off their student loans, or for that matter to meet all sorts of other financial obligations."). However, while the majority of the jobs Plaintiff applied for

---

[18] Some courts analyze this aspect of maximizing income while minimizing expenses under the third prong of the *Brunner* test. *See e.g., In re Carter*, 517 B.R. 870, 879 (Bankr. N.D. Ill. 2014). Indeed, in adopting the *Brunner* test, it was so stated that the analysis falls under prong three. *See Roberson*, 999 F.2d at 1136. But, because whether a debtor can maintain a minimum standard of living is intrinsically tied to a budget with maximized income and reduction of unnecessary costs, the argument will be analyzed here and later restated in the third prong.

[19] The admitted evidence was that Plaintiff applied to over 194 positions (mostly related to her profession). Furthermore, Plaintiff testified that she applied to numerous part-time and retail positions which were not listed in her exhibits.

(openings in associate or manager positions in marketing) did fall within her area of experience, Plaintiff also submitted evidence that she applied to several retail positions of the nature that Defendant believes she should be looking for.

Defendant further argues that Plaintiff acted inappropriately in voluntarily quitting her previous position in anticipation that the job was to be ended instead of remaining at her position. But, Plaintiff testified that her employer informed her that the department she was in was set to be dissolved after the company was acquired by another entity. Plaintiff further testified at trial that the position itself was eliminated shortly after she resigned. Moreover, Plaintiff has provided testimony that she was pressured to quit, and she even received severance when she quit. Her testimony is uncontested. Therefore, it was not inexcusable for Plaintiff to have left her previous position. No evidence was presented suggesting Plaintiff was attempting to derive some benefit by leaving her job shortly before it was eliminated.

On the contrary, the fact that she immediately began applying for work in her field and her sincere efforts throughout this adversary case indicates that she did not attempt to "game" the bankruptcy system. Rather, she sought to maximize her income. But, it has been impossible for her to obtain employment. Several of her applications resulted in job interviews, at least eleven resulted in second interviews, and at least one resulted in a third interview. Yet, none of those applications – not the jobs Plaintiff is explicitly qualified for, nor the retail positions – have borne any fruit.[20] Nonetheless, Plaintiff's sincere efforts and thorough attempts to find employment and to maximize her income are plainly recognized.

2.  Plaintiff's Expenses Are Beyond Minimal

Section 523(a)(8) requires the debtor to engage in "belt-tightening" practices to make repayment of loans more likely. *In re Tuttle*, 600 B.R. 783, 800 (Bankr. E.D. Wis. 2019); *Clark*, 341 B.R. at 249. A debtor is expected to "make some sacrifices and live within the strictures of a frugal budget for the foreseeable future." *In re Davis*, 608 B.R. 693, 704 (Bankr. N.D. Ill. 2019) (Barnes, T.) (citations omitted). But, the *Brunner* test does not require the debtor to live a life of poverty to pay back his or her student loans. *Larson v. United States (In re Larson)*, 426 B.R. 782, 789 (Bankr. N.D. Ill. 2010); *In re Kehler*, 326 B.R. 142, 147 (Bankr. N.D. Ind. 2005).

---

[20] Plaintiff testified that the only employment she was able to retain was a seasonal part-time position during the past summer.

In the present case, Plaintiff has presented compelling evidence that she has minimized her expenses. Plaintiff has given up both of the vehicles she used to own and no longer pays for related vehicle insurance costs. Plaintiff has moved out of her previous apartment where she paid approximately $1,500 per month in rent and is now temporarily living rent free at a friend's condominium in exchange for assisting the owner with finding boarders. Furthermore, Plaintiff is on a governmental supplemental nutritional assistance program. In light of the foregoing, it is evident that Plaintiff has done all that she can to minimize her expenses. Plaintiff has essentially removed the largest three household expenses from her budget: housing, transportation, and the majority of her food costs. *See CONSUMER EXPENDITURES—2018*, U.S. Bureau of Labor Statistics, (Sept. 10, 2019) https://www.bls.gov/news.release/cesan.nr0.htm. Indeed, her budget is trimmed to the bone.

Defendant asserts that Plaintiff has not minimized her budget sufficiently as some of the expenses found in Plaintiff's recent bank records are frivolous and unnecessary. Specifically, Defendant points to certain charges for entertainment services, uses of ride share apps, and delivery of food through apps. For example, Defendant argues that Plaintiff's expense of $360 in food delivery costs during a period of two to three months is excessive.

However, Plaintiff has presented uncontested testimony that the majority of those allegedly excessive expenses on the joint bank account statements were incurred by the other joint account holder and not by her. The uncontroverted testimony was that almost all of the charges for the expenses Defendant has questioned were in fact not spent by Plaintiff.

As to the allegedly excessive food costs, to which Plaintiff has admitted were hers, the fact that Plaintiff spends $360 in food costs for the period of two to three months is clearly not excessive at all. *See e.g. In re Vargas*, No. ADV 08-8135, 2010 WL 5395142, at *3 (C.D. Ill. Dec. 22, 2010) (food costs for one in the amount of $200 per month was reasonable); *In re Armstrong*, No. 10-82092, 2011 WL 6779326, at *7 (Bankr. C.D. Ill. Dec. 27, 2011) ($600 per month in food expenses for two is excessive whereas $475 per month is adequate); *see also National Standards: Food, Clothing and Other Items*, Internal Revenue Service, (January 16, 2020) https://www.irs.gov/businesses/small-businesses-self-employed/national-standards-food-clothing-and-other-items (IRS national standards allow for a minimal food living expense of $386 per month for one individual).

Moreover, Defendant misses the point. Regardless of these disputed expenses, Plaintiff's current situation, quite frankly, is nowhere sufficient to meet a minimum standard of living. A minimally necessary standard of living includes for basic needs such as food, shelter, reasonable automobile costs, and medical costs. *Clark*, 341 B.R. at 249; *Lewis v. Ill. Student Assistance Comm'n*, 276 B.R. 912, 917 (Bankr. C.D. Ill. 2002). Here, Plaintiff has no present income and does not receive unemployment benefits. She currently subsists off of government nutritional assistance and short-term loans from her friends and family. Plaintiff's medical costs are aided by Medicaid. She has a temporary living arrangement that clearly cannot extend indefinitely. Moreover, Plaintiff gave up her vehicles altogether. Therefore, even if Plaintiff's allegedly unnecessary expenditures are indeed excessive, the possibility of questioning particular expenditures in Plaintiff's budget would get Defendant nowhere. The issue is not whether particular expenses in a debtor's budget are unreasonable. Rather, the overall budget must be viewed as a whole to determine whether the debtor can sustain a minimal standard of living. *In re Larson*, 426 B.R. 782, 792 (Bankr. N.D. Ill. 2010); *Vargas*, 2010 WL at *4 ("The *Brunner* test ought not be turned . . . into a game of 'gotcha' based on viewing certain expenditures in isolation, wearing blinders that disregard the debtor's needs in a global fashion.") (quoting *In re Zook*, No. 05-00083, 2009 WL 512436, at *9 (Bankr. D.D.C. Feb. 27, 2009)). Here, even if assuming a reduction of the allegedly excessive costs, Plaintiff would still be pushed beyond her limits by her necessary expenses to allow for any payments on her student loan. Plaintiff has no income. Defendant is pointing to pennies that may be saved when much more is needed for Plaintiff to maintain even a minimum standard of living.

Put simply, given Plaintiff's frugal lifestyle and overall significant budget shortfalls, including the lack of money to provide for even basic needs, she would be unable to maintain a minimal standard of living if required to repay her student loan. Therefore, Plaintiff has satisfied the first prong of the *Brunner* test.

## B. The Record Demonstrates Plaintiff's Inability to Pay Will Persist

The second prong of the *Brunner* test asks whether additional circumstances show that a debtor's inability to pay is likely to persist for a significant portion of the repayment period. *Tetzlaff v. Educ. Credit Mgmt. Corp.*, 794 F.3d 756, 759 (7th Cir. 2015) (citations omitted). Unlike what Defendant argues, there is no requirement that the debtor's state of affairs persist forever or that the debtor must demonstrate that he will never be able to obtain a job. *See id.*

The original *Brunner* test, as adopted by the Seventh Circuit, required applying a "certainty of hopelessness" standard, which has since been heavily applied to the second prong. *Roberson*, 999 F.2d at 1135. This strict standard has been heavily criticized by many courts as overtaking the language of the statute itself. *See e.g. In re Rosenberg*, 610 B.R. 454, 459 (Bankr. S.D.N.Y. 2020) (criticizing the "certainty of hopelessness" standard as dicta that has overtaken the language of the *Brunner* test). Recently, Seventh Circuit has softened the harsh standard. In *Krieger v. Educ. Credit Mgmt. Corp.*, the Seventh Circuit noted that "[boiling] the three criteria [of the *Brunner* test] down to 'certainty of hopelessness' . . . sounds more restrictive than the statutory 'undue hardship' [requirement]." 713 F.3d 882, 885 (7th Cir. 2013). In that case, the Seventh Circuit clarified that "[i]t is important not to allow judicial glosses, such as the language in *Roberson* and *Brunner*, to supersede the statute itself." *Id.* at 884. Replacing the statutory requirement with a harsher standard would only obstruct the "fresh start" purpose of the discharge provided by the Bankruptcy Code to the honest, but unfortunate debtor.

Nonetheless, to satisfy the second prong of the *Brunner* test, it must still be shown that the current inability to pay on the loan while maintaining a minimum standard of living "is likely to continue for a large portion of the repayment period based on the existence of additional circumstances, beyond the terms of the loans themselves." *Davis*, 608 B.R. at 705. "Generally, the more time that has passed since the educational loan became payable, the easier it is for a debtor to pass the second prong of the test. *In re Armstrong*, No. 10-82092, 2011 WL 6779326, at *8 (Bankr. C.D. Ill. Dec. 27, 2011). "In the absence of some reason to expect change, a lengthy history of financial struggles is a valid indicator of more of the same." *Id.*

Here, Plaintiff has presented several explanations as to why she is unable to improve her financial situation (her lack of employment), and therefore her inability to repay the loan while maintaining a minimum standard of living is likely to persist. First, Plaintiff asserts that her past employment with LandAmerica has negatively impacted her professional reputation (as the company purportedly ran a Ponzi scheme and later went bankrupt). Second, Plaintiff argues that the fact that she has been involved with various legal proceedings itself is a deterrent to future employment as employers routinely perform Internet searches on prospective hires and are reluctant to hire her for a senior position because of her bankruptcy and tax dispute. In support of this, Plaintiff has introduced evidence that a Google search under her name and city reveal her bankruptcy, the prior judgment holding the debt non-dischargeable, and her involvement with a

16

tax matter in the United States Tax Court in 2015. Third, Plaintiff contends that her age is also a factor against her as marketing professionals favor hiring younger candidates who are more adept with modern technology. Lastly, Plaintiff argues that a barrier to her being hired is the fact that it has been thirty years since the completion of her formal education.

Additional circumstances are present in this case. In *Krieger*, the Seventh Circuit affirmed the bankruptcy court's holding that the debtor was eligible for a discharge of her student loans based on the debtor's extensive job search, her difficulty in obtaining employment, and on the fact that "there is no reason to think that a brighter future is in store" in light of her sparse work history. 713 F.3d at 884. In that case, the debtor was a healthy, 53 year old woman living with her elderly mother in rural Illinois. *Id.* at 885. Even after applying to approximately 200 jobs over a ten-year period, she could not find employment near her region, a rural area with little job prospects. *Id.* Given that the debtor lacked the funds necessary to travel to work, or to move in search of better employment prospects where more jobs would be available, the Seventh Circuit held that she could not look beyond the rural area in which she lived. *Id.*

The facts in this case, while not identical, are analogous to the facts in *Krieger*. Similar to the debtor in *Krieger*, Plaintiff is also in her early 50s and lives with others (in a friend's condominium). Her ability to travel is also restricted to a local area, although not quite as limited as the debtor in *Krieger*. Plaintiff has given up both of her vehicles and cannot afford to travel far. But, due to available public transportation, she does have access to local work prospects. Unlike the debtor in *Krieger*, Plaintiff lives in a metropolitan area where more jobs are available. Here, Plaintiff has been more active than the debtor in *Krieger* in applying for work. Specifically, she has applied to over 200 jobs in approximately sixteen months. Yet, her search has been just a fruitless as that of the debtor in *Krieger*. Given that here, with jobs available more abundantly near her residence than in the rural area described in *Krieger*, the amount of time needed to determine whether her state of unemployment is likely to persist is far shorter. Therefore, the fact that Plaintiff conducted a sixteen month search without finding work is enough to determine that the circumstances is likely to persist for a significant period of the repayment period. *See Krieger*, 713 F.3d at 884.

Furthermore, as in *Krieger*, Plaintiff's intermittent work history is not the kind employers are looking for. As detailed in the Findings of Fact, it is abundantly clear that Plaintiff has had much difficulty obtaining and maintaining employment in the past. Now, Plaintiff has offered

17

substantial evidence as to her inability to find employment in a period over sixteen months. Her evidence lists in extensive detail the type of positions applied for, the company the positions were for, the date applied, the follow-up attempts, the results of the position, and her personal notes as to each application. Furthermore, the record is clear that not only is the Plaintiff having trouble landing something in her chosen field of experience, she has also struggled to obtain a retail position. The bankruptcy court in *Krieger* stated that "[n]ever has the Court seen such utter futility be the result of a debtor's job search efforts." *In re Krieger*, No. 11-80144, 2012 WL 1155687, at *6 (Bankr. C.D. Ill. Apr. 5, 2012), *rev'd sub nom. Educ. Credit Mgmt. Corp. v. Krieger*, 482 B.R. 238 (C.D. Ill. 2012), *rev'd and remanded*, 713 F.3d 882 (7th Cir. 2013). So does this Court here.

In addition, the Plaintiff is truly destitute and has been in this straight for well over a year without any respite. Her dire financial circumstances are also likely to persist based on her financial history. Plaintiff's loans became due for repayment in 1991. Plaintiff defaulted in 1992. Since then, her extensive repayment history, with frequent forbearances and deferments, unmistakably demonstrate her longstanding financial difficulties (and her persistent, good-faith efforts to repay the loan) for over two decades. Currently, she has no money of her own and relies on assistance from her friends, family, and government support. There is no evidence to suggest the possibility of any change in the future.

Accordingly, it is concluded, based on the evidence, that Plaintiff has no prospect of being able to repay the loans at any time in the foreseeable future. For this reason, Plaintiff has met her burden under the second prong of the *Brunner* test.

### C. Good Faith Efforts to Repay

The final prong of the *Brunner* test asks whether debtor has demonstrated "good faith efforts to repay the loans." *Roberson*, 999 F.2d at 1135. This good faith effort is "measured by [a debtor's] efforts to obtain employment, maximize income, and minimize expenses." *Id.*

As discussed more fully above in the first prong, Plaintiff has indeed attempted to seek employment and to maximize her income. Moreover, she has more than adequately minimize her expenses. In addition, her good faith efforts to repay her loan is further detailed in her extensive payment history as listed above in this Court's Findings of Fact. While it is true Plaintiff has sought and received several forbearances on her student loan as a result of periods of unemployment or other financial difficulty, by the time she filed for bankruptcy relief in November of 2015, Plaintiff had paid a total of $29,122.25 on the loan that was consolidated in 1997. That amount is more than

the principal amount (nearly 140% of the original balance of $20,896.00), so it is clear that Plaintiff's difficulties result from the interest accrued during the periods of time during which she was unable to make payments on the loan and received forbearances or deferrals.

In light of the foregoing, Plaintiff has clearly established that she has made a good faith effort to repay the student loan, and has thus satisfied her burden under the third prong of the *Brunner* test.

## CONCLUSION

For the aforementioned reasons, it is clear that Plaintiff has met the strict requirements of the *Brunner* test. Accordingly, because her student loan debt constitutes an "undue hardship" under 11 U.S.C. § 523(a)(8), Plaintiff's student loan debt will be discharged by amended Judgment Order entered concurrently herewith.

ENTER:

_____
Jack B. Schmetterer
United States Bankruptcy Judge

Dated this _____ day of February, 2020